2001 ME 41

**CITIZENS BANK NEW HAMPSHIRE**

v.

**ACADIA GROUP INC., et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs Jan. 18, 2001.

Decided Feb. 27, 2001.

Timothy H. Norton, Esq., U. Charles Remmel II, Esq., Kelly, Remmel & Zimmerman, Portland, for plaintiff.

Barbara T. Schneider, Esq., Peter S. Plumb, Esq., Murray Plumb & Murray, Portland, for parties in interest Fidelity Investments et al.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] Citizens Bank New Hampshire appeals from the order of the Superior Court (Cumberland County, *Mills, J.*) dissolving an *ex parte* attachment in an action brought by Citizens Bank against Acadia Group, Inc., Medlecture.com, Inc., and Acadia National Health Systems, Inc. (collectively referred to as Acadia). Citizens Bank alleges that Acadia defaulted on the terms of two loans, and the bank seeks a judgment for the balance owing. Citizens Bank argues that a prejudgment attachment is necessary to enforce its rights and remedies under the loan documents. Only Fidelity Investments and Fidelity Investments Institutional Services Co., Inc., who were served with trustee process pursuant

to M.R. Civ. P. 4B, have filed a responsive brief. Acadia has not appeared on appeal. We vacate the order of the Superior Court dissolving the attachment order and remand for further hearing.

## I. BACKGROUND

[¶ 2] In July 1999, Acadia National Health Systems, Inc. (ANHS) obtained two loans from Citizens Bank: (1) a $1,250,000 line of credit loan; and (2) a $250,000 term loan. In December 1999, ANHS reorganized into three groups. Acadia Group, Inc. is the holding company which acts as a management company to two subsidiaries: (1) ANHS, a health care billing company for physicians, and (2) Medlecture.com, Inc., a distance learning company which provides information to physicians and other health care individuals via the internet. After this reorganization, Acadia reaffirmed the two loans with Citizens Bank in a new loan agreement.

[¶ 3] The loans are secured by collateral, including all of Acadia's business assets. Acadia's primary asset is its accounts receivable. Additionally, John Raden, Acadia's chief operating officer, gave a full guaranty on both loans. The termination date of the line of credit loan was April 30, 2000, and the due date of the term loan is June 15, 2004. By the terms of the loans, a default on the line of credit loan is a default on the term loan. When April 30, 2000 passed without payment of the line of credit loan, Citizens Bank notified Acadia of the default and made a demand for payment on both loans.

[¶ 4] On June 29, 2000, Citizens Bank filed the complaint against Acadia seeking payment on the loans and sought an *ex parte* attachment order. The Superior Court (*Cole, J.*) granted the bank's motion for an *ex parte* attachment on trustee process in the amount of $989,036.40. An affidavit accompanying the attachment motion, by an officer of Citizens Bank who had reviewed the books and records of Acadia, averred that Acadia owed Citizens Bank a total of $1,389,036.40 on the two loans and was suffering losses at the rate of $250,000 monthly. The affidavit stated that Citizens Bank held a security interest in Acadia's accounts receivable and that a field audit revealed that the accounts receivable had a "realizable value" of approximately $400,000. Citizens Bank served trustee summonses on Acadia's depository institutions, including Fidelity, on June 30, 2000.

[¶ 5] On July 10, 2000, Acadia filed a motion seeking dissolution of the attachment and trustee process accompanied by affidavits from the chief financial officer of Acadia and from Acadia's board chairman. An evidentiary hearing was held on July 12, 2000. Citizens Bank presented several affidavits to the court including the affidavit of the consultant who examined Acadia's books and finances in June 2000. Acadia presented two witnesses in addition to its chief financial officer, who testified that the collectible value of Acadia's accounts receivable, after making certain adjustments required by Citizens Bank, was $1,057,000. On cross-examination, Acadia's witness agreed that banks "lend on eighty percent or some other formula," and the purpose of the eighty percent formula is to ensure proper collateralization because some accounts are difficult to collect. The witness also agreed that if a business "evaporates" there is a diminution in the amount of accounts receivable that can be collected.[1] The witness agreed that the value of Acadia's accounts receivable, reduced by twenty percent, was $845,000. Acadia also presented evidence that the Raden guaranty had an estimated value between $800,000 and $1,100,000.[2]

---

1. The line of credit portion of the loan agreement states that the amount available to be advanced to Acadia by Citizens Bank is "an amount equal to the lesser of (i) the sum of eighty percent (80%) of Eligible Accounts of [Acadia] plus $250,000 or (ii) $1,250,000 (the "Revolving Credit Commitment Amount")."

2. An additional subject of argument at the motion hearing was the propriety of the *ex*

Acadia further presented evidence that Citizens Bank recently obtained $110,000 from Acadia's operating account at Northeast Bank, not by trustee process but pursuant to a separate assignment by Acadia.

[¶ 6] The court found that there was no dispute that Citizens Bank would recover judgment. The court further found that the amount owing on the two loans as of June 27, 2000, was $1,389,036.40, with a per diem of $364.25. The court expressed concern about the lack of qualifications of Citizens Bank's consultant who had performed the audit of Acadia and whose report and affidavit had been submitted to the court. The court stated that the bank's officer, whose affidavits were before the court, lacked an understanding of Acadia's business. The court found Acadia's testimonial evidence more reliable than Citizens Bank's affidavits and consultant's report. The court also noted that Acadia had satisfactorily explained certain concerns raised in the consultant's report. The court found that the value of the accounts receivable was $1,057,080, and that the difference between the value of the accounts receivable and the amount owing on the loans was $331,956. The court concluded that Raden's guaranty was included within the definition of "collateral" in the loan agreement, and that Citizens Bank was not undercollateralized if the guaranty was included as collateral. The court made no finding as to whether the $331,956 figure should be further reduced by the $110,000 obtained from Acadia's operating account, as such finding was not necessary given the court's view of the Raden guaranty. The court dissolved the *ex parte* attachment order.

[¶ 7] Citizens Bank argues the court erroneously treated the Raden guaranty as collateral and erroneously calculated the value of collateral. As we noted above, Acadia has not appeared in this appeal.

Fidelity only argues the court did not err in determining the value of the collateral.

## II.  THE GUARANTY

■ [¶ 8] The court found that Acadia was not undercollateralized because the Raden guaranty was an asset of Acadia. The court expressly determined that the Raden guaranty was collateral. Acadia argued at the hearing on the motion to dissolve the attachment that the definition of collateral in the notes included the Raden guaranty. "Collateral" is defined in the loan agreement as "all guaranties, liens and security granted to or held by [Acadia] with respect to an Account or any other obligation owing to [Acadia] . . . ." Citizens Bank argues that for a guaranty to come within this definition it has to be a guaranty granted to Acadia, not a guaranty granted to Citizens Bank. We agree that the definition of collateral does not include the Raden guaranty because it is a guaranty granted to Citizens Bank; it is not a guaranty granted to Acadia. The court erred in dissolving the attachment order on the basis of including the Raden guaranty as collateral.

## III.  VALUE OF ACCOUNTS RECEIVABLE

[¶ 9] Citizens Bank argues that the court erred as a matter of law in finding that the value of Acadia's accounts receivable was $1,057,080. Citizens Bank acknowledges that the court found Acadia's evidence to be more credible than the bank's affidavits and consultant's report, but it argues that even relying solely on Acadia's evidence, the court should have reduced the accounts receivable value by twenty percent. Citizens Bank contends that Acadia's own evidence is that the $1,057,080 figure is the value of accounts receivable of a going concern. The bank argues that the court should have concluded, *as a matter of law,* that the liquidation value of the accounts

*parte* order. Because a hearing was held on Acadia's motion to dissolve the attachment, the propriety of the issuance of the order *ex*

*parte* became moot. *See Plourde v. Plourde,* 678 A.2d 1032, 1035 (Me.1996).

receivable is the operative value for purposes of an attachment motion. The liquidation value, contends the bank, is eighty percent of the going concern value of the accounts receivable.

[¶ 10] In determining the amount of an attachment order the court must determine the amount of the judgment that the plaintiff will, more likely than not, recover. The court must also determine the amount of "any liability insurance, bond, or other security, and any property or credits attached by other writ of attachment or by trustee process shown by the defendant to be available to satisfy the judgment." M.R. Civ. P. 4A(c). *See also* M.R. Civ. P. 4B(c). The amount of the "insurance, bond or other security" must be subtracted from the amount of the likely judgment to arrive at the specified amount of the attachment or trustee process. M.R. Civ. P. 4A(c), 4B(c).

▆ [¶ 11] The issue here is the amount of "other security," that is, the amount of the collateral in which Citizens Bank held a security interest. Citizens Bank argues that the attachment process means that the assets attached by the bank, as well as the collateral, will be subject to a forced sale because such a sale is the only way for the bank to liquidate the assets. Citizens Bank, however, does not point us to any authority that would require a court to utilize a liquidation value of "other security" rather than a going concern value. We are unaware of any court stating that, in valuing the collateral securing a loan when an attachment is requested, the liquidation value of the collateral, as opposed to any other method of valuing the collateral, must be utilized.

▆ [¶ 12] We have often held that the determination of the method of valuation and the value of an asset is a finding

of fact. *See Kapler v. Kapler,* 2000 ME 131, ¶¶ 9–11, 755 A.2d 502, 506–07 (holding that review of divorce court's determination of property value is for clear error); *Rangeley Water Co. v. Rangeley Water Dist.,* 1997 ME 32, ¶ 10, 691 A.2d 171, 175 (upholding referee's valuation method of utility property and stating referee not compelled as matter of law to adopt particular valuation method); *Pongonis v. Pongonis,* 606 A.2d 1055, 1057–58 (Me.1992) (concluding that determination of pension value is finding of fact). We are not persuaded that, for attachment motions, we should depart from this established law. Furthermore, even if we were inclined to establish a rule of law requiring a court to employ the liquidation value when determining the value of a secured interest, the lack of evidence in this case does not make it appropriate to do so. Citizens Bank did not present reliable evidence regarding the collectibility of the "other security." Its sole evidence on the subject was documentary and relied primarily on a consultant's report without presenting the qualifications of the consultant. The court was not required to find, as a matter of law, that the "other security" available to satisfy the judgment likely to be recovered was worth eighty percent of its value. Therefore, the court did not clearly err in its determination of the value of Acadia's accounts receivable.

[¶ 13] We conclude that Citizens Bank was entitled to an attachment order or trustee process in the amount that its loans were undercollateralized. Because the current situation is likely to be different from that presented to the court in June 2000, the matter is remanded to the court for a further hearing and, if appropriate, the issuance of an attachment order.[3]

---

3. Citizens Bank also argues that if this Court orders reinstatement of the attachment order, even in a reduced amount, such reinstatement must be retroactive. The bank's reliance on M.R. Civ. P. 62(f) for this proposition is misplaced. That rule simply provides that when

there has been an attachment and an appeal is taken from the judgment in the case, the attachment remains in effect during the pendency of the appeal. Rule 62 is not authority for a retroactive reinstatement of an attachment. Citizens Bank also relies on *Plumbago*

The entry is:

Order dissolving attachment order is vacated. Case remanded to the Superior Court for further proceedings consistent with this opinion.

*Mining Corp. v. Sweatt,* 444 A.2d 361 (Me. 1982). In that case an attachment that had been dissolved erroneously was reinstated by this Court, and we ordered the defendant to return the object of the attachment order, a foot locker, to the sheriff who had been given custody of the item under the original attachment order. *Id.* at 368, 371. *Plumbago* is not authority for a retroactive reinstatement.